UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EUGENE SZYMANSKI,

                       Petitioner,                             Civil No. 05-10241
                                                             Honorable David M. Lawson

v.

PAUL RENICO,

                       Respondent.

_____/

**OPINION AND ORDER DENYING AMENDED
PETITION FOR WRIT OF HABEAS CORPUS**

      Petitioner Eugene Szymanski was convicted by a Wayne County, Michigan jury of assault

with intent to do great bodily harm less than murder, felon in possession of a firearm, and possession

of a firearm during the commission of a felony.   He filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, amended twice, identifying a number of claims for relief.   The

respondent has filed a response to the petition.   The Court finds that the petitioner's claims lack

merit.   The Court, therefore, will deny the petition.

I.

A.

      The petitioner was charged with assault with intent to commit great bodily harm less than

murder, felon in possession of a firearm, and felony firearm, following the shooting of James Elmore

on October 22, 2002, outside the Gold Coast Club in Detroit.

      The petitioner's first trial ended with a deadlocked jury.   His second trial commenced in

September 2003.  Before trial, the petitioner filed a written motion and made several verbal requests

to represent himself. That request was granted, and the petitioner engaged in self-representation.

James Elmore testified that on October 22, 2002, he drove his vehicle, a GMC Jimmy, to the Gold Coast Club, arriving at approximately 9:30 p.m.  He parked his vehicle across Seven Mile Road from the Gold Coast.  He was at the Gold Coast for approximately one hour and drank three gin and tonics.  Elmore testified that he left the Gold Coast at approximately 10:30 p.m.  He denied feeling intoxicated.  Elmore entered his vehicle and started to drive away, when he realized that his front, passenger-side tire was flat.  Elmore testified there was too much traffic on Seven Mile Road to safely change the tire, so he pulled into a parking lot he knew to be the Gold Coast's.   When Elmore entered the parking lot, a parking lot attendant carrying a radio approached his car.  When the attendant determined Elmore's reason for being in the parking lot, the attendant radioed a woman who angrily stated that Elmore could not stay in the parking lot.  The attendant, who had been standing on the passenger side of Elmore's car, left Elmore's sight.

A few moments later, Elmore heard someone yelling profanities at him and ordering him off the lot.  Elmore shouted back that he just wanted to change his tire.  Elmore identified the petitioner as the man who approached his car.  He recognized the petitioner because he had seen him working at the Gold Coast Club over the past year and a half.  As the petitioner neared Elmore's vehicle, continuing to yell at Elmore, Elmore exited his vehicle.  He argued with the petitioner, asking why he could not simply change his tire in the parking lot.  The petitioner continued to walk toward him, hitting Elmore twice in the face when close enough to do so.  Elmore threw the petitioner against his car and punched the petitioner in the face.  Elmore testified that in the next moment, he felt something against his arm and then heard a loud bang.  He knew he had been shot in his bicep.  He heard only one gunshot.  During this entire encounter, he saw no one else in the parking lot except the petitioner and, earlier, the parking lot attendant.  Elmore asked the petitioner why he had done

that.  The petitioner did not answer.   Elmore got back into his car and drove to the Gold Coast's entrance.  He entered the bar and told an employee he had been shot.  As he described the perpetrator to police, a woman named Lisa said that it sounded like Eugene.

Rodney Williams testified that he was employed as a valet on the date of the shooting. Williams was responsible for security in the parking lot and for ensuring that no one parked in the lot without paying the parking fee.  Williams testified that on October 22, 2002, a man driving an SUV pulled into the lot to change a flat tire.  Williams radioed his supervisor Lisa Burleson to report the vehicle.  Burleson denied permission for the individual to change his tire in the lot.  Williams returned to his own car and observed a man wearing a black leather jacket walk toward the SUV. Williams observed the SUV rocking back and forth, then heard a gunshot.  The man in the black jacket then fled.  Williams could not identify the petitioner as the man in the black jacket.  Williams testified that he also went by the name "JR" or "junior".

Lisa Burleson testified that she was working at the Gold Coast on October 22, 2002.  She testified that the petitioner worked as a security guard at the Gold Coast.  At approximately 11:00 p.m. on the night of the shooting, Williams radioed her to report an unauthorized vehicle with a flat tire in the parking lot.  After the radio transmission, she saw the petitioner exit the club and enter the parking lot.  A short time later, she heard a single gunshot.

City of Detroit Police Officer Jenny Kappel testified that shortly before midnight on October 22, 2002, she and her partner, Andrew Guntzviller, responded to a dispatch report of a shooting at the Gold Coast nightclub.  She interviewed Elmore in a back office.  Elmore described the shooter as a white male, approximately 59 years old, 6 feet tall, 220 pounds, black hair, glasses, black coat, white t-shirt, and black jeans.  Officer Kappel testified that Elmore did not appear intoxicated.  She

-3-

looked at the gunshot wound and noted there was a dark mark around the wound.  Officer Kappel understood the dark mark to be characteristic of a gun having been fired in close proximity to the victim.  The parking lot attendant identified the man who approached Elmore in the parking lot as the petitioner.

William Steiner, a forensic chemist employed by the Detroit Police Department, testified as an expert witness.  He testified that he examined the coat worn by Elmore when he was shot and noted two holes in the arm of the jacket.  Steiner concluded that the unburnt powder residue surrounding one of the holes known as "stipple" and the "star" shape of the same hole established that the gunshot was a "contact" hole.

Police Officer Steven Brown testified that he took a statement from the petitioner on November 4, 2002 after advising the petitioner of his constitutional rights which he read into the record.  Officer Brown read the petitioner's statement into the record.  The petitioner told Officer Brown that he worked as a security guard at the Gold Coast.  On October 22, 2002, he heard a radio transmission indicating that an individual was blocking the entrance to the parking lot, so he exited the nightclub and proceed to the parking lot.  He stated that he saw two males standing on the driver's side of an SUV.  The men were arguing.  The petitioner ordered them to leave the parking lot.  The petitioner stated that one of the men threw him against the SUV and punched him in the face, knocking off his glasses.  The petitioner stated that he heard a gunshot.  He ran to hide behind a garbage dumpster from where he heard a second gunshot.  He remained hidden.  The petitioner stated that he remained hidden until the police left because other employees advised him to do so and not to talk to the police.

-4-

The petitioner presented a single witness in his defense, John Earl Pierce. Pierce testified that on the date of the shooting, he was employed as a valet for his aunt, Lisa Burleson. Burleson told him an unauthorized vehicle was in the parking lot. He headed toward the parking lot, but returned to the bar before reaching the parking lot because he remembered an unpleasant event that happened a few weeks earlier in the parking lot. Before he decided to return to the nightclub, he saw four individuals in the parking lot. He identified them as the petitioner, Elmore, an employee known to him as Junior, and another unidentified man. A few moments after he returned to the nightclub, Elmore appeared saying he had been shot. Pierce claimed he talked to police officers the night of the shooting, but stated that he had never been asked to sign a witness statement.

The petitioner was convicted of assault with intent to do great bodily harm less than murder, being a felon in possession of a firearm, and possession of a firearm during the commission of a felony. He was sentenced as a fourth habitual offender to 80 to 300 months in prison for the assault conviction and lesser terms for the weapons offenses.

### B.

The petitioner filed a direct appeal in the Michigan Court of Appeals. He raised the following claims on appeal:

I. Defendant was denied his Constitutional right to remain silent when his pre-arrest silence was offered as substantive evidence of his guilt at trial and the Assistant Prosecutor urged the jury to use Defendant's silence as such.

II. Defendant was denied a fair trial and the ability to effectively cross examine his accuser because the police report he received was redacted of significant information.

III. The trial court abused its discretion and denied Defendant a fair trial when it erroneously admitted a letter supposedly written by Defendant and admitted testimony about stipple found on the victim's pull over.

Pet.'s Br. on Appeal at ii.  The Michigan Court of Appeals affirmed the convictions.  *People v. Szymanski*, No. 252378, 2005 WL 562822 (Mich. Ct. App. Mar. 10, 2005).

The petitioner filed a *pro se* application for leave to appeal in the Michigan Supreme Court, raising the same grounds presented to the Michigan Court of Appeals and the following additional grounds: (i) the prosecutor improperly vouched for the victim's credibility; (ii) the prosecutor improperly used witness Steiner to introduce a photo that the witness had not seen before;  (iii) the prosecutor's closing and rebuttal arguments were improper; (iv) the prosecutor submitted facts not in evidence in the prosecutor's brief in the court of appeals; and (v) appellate counsel was ineffective by failing to order the lower court transcripts.  The Michigan Supreme Court denied leave to appeal. *People v. Szymanski*, 474 Mich. 857, 702 N.W.2d 585 (Mich. Aug. 30, 2005) (table).

On September 14, 2005, the petitioner filed a habeas corpus petition raising multiple claims that the petitioner's constitutional rights were violated during the state court proceedings.  The petition raised the following claims: (i) new evidence demonstrates that the wound described as an entrance wound at trial was actually an exit wound and that the complainant was intoxicated; (ii) appellate counsel was ineffective by failing to investigate errors committed during the trial; (iii) the prosecutor obtained testimony as to the complainant's wounds from a police officer who was not an expert on pathology or wound examination; (iv) the prosecutor presented false testimony that the complainant was not drunk; and (v) the prosecution suppressed a statement from the complainant to the police.  The petitioner filed an amended petition on January 5, 2006, raising the following issues: (i) the prosecution failed to turn over exculpatory materials; (ii) the prosecution's use of expert testimony as to gunshot residue on the complainant's jacket was misleading; (iii) the petitioner was denied effective cross-examination when the prosecution did not allow the petitioner

-6-

to consult with a gunshot residue expert; (iv) the Michigan Court of Appeal's application of the harmless error doctrine was contrary to law because the state did not raise the argument in its appellate brief; (v) the officer in charge of the case did not locate one of the petitioner's trial witnesses; and (vi) the petitioner was forced to represent himself.  Many of the claims in the petitioner's petitions were not exhausted.  The petitioner filed a motion to hold his habeas petition in abeyance to allow him to pursue state remedies for the unexhausted claims.  The Court granted the motion, permitting the petitioner to file a motion for relief from judgment with the state trial court on or before January 31, 2008.

The petitioner filed a motion for relief from judgment in the trial court.  Through counsel, he raised the following claim: "[The trial court] violated [the petitioner's] due process rights by accepting [the petitioner's] equivocal request to represent himself and failing to appoint substitute counsel."  Pet.'s Mot. for Relief from Judgment at 3.  In a *pro se* supplemental brief, he raised these additional claims:

> (1) [The petitioner] is entitled to a new trial based on newly-discovered evidence that the complainant was shot in the back and the wound characterized as an entrance wound was in fact an exit wound; and newly-discovered evidence that the complainant was intoxicated at the time of the incident;

> (2) the prosecutor withheld the above-described newly discovered evidence in violation of [the petitioner's] due process rights;

> (3) the prosecutor violated [the petitioner's] due process right by eliciting false testimony about the complainant's wounds and false testimony that the complainant was not intoxicated at the time of the incident; and

> (4) prior appellate counsel was constitutionally ineffective in failing to raise the foregoing issue on appeal.

Pet.'s *Pro Per* Mot. for Relief from Judgment at 3.  The trial court denied the motion.  *People v. Szymanski*, No. 03-004408-01 (Wayne Cnty. Cir. Ct. June 12, 2008).

-7-

The petitioner filed an application for leave to appeal in the Michigan Court of Appeals. Through counsel, the petitioner raised the following claim: "The trial court violated [the petitioner's] due process rights by accepting [the petitioner's] equivocal request to represent himself and failing to appoint substitute counsel." Pet.'s Mot. for Leave to Appeal at 14. The petitioner also filed a motion for leave to file a *pro se* supplemental application for leave to appeal raising the following issues:

> I. The trial court failed to ensure that the representation sought by [the petitioner] entailed a waiver of his Sixth Amendment right to counsel.
>
> II. [The petitioner] is entitled to a new trial based on newly discovered evidence that the complainant was shot in the back and the wound characterized as an entrance wound was in fact an exit wound; and newly discovered evidence that the complainant was intoxicated at the time of the incident; the prosecutor withheld the above-described newly discovered evidence in violation of [the petitioner's] due process rights; and the prosecutor violated [the petitioner's] due process rights by eliciting false testimony about the complainant's wounds and false testimony that the complainant was not intoxicated at the time of the incident.
>
> III. Judge Sullivan had an unconstitutional *ex parte* conversation with a juror.
>
> IV. Appellate Counsel was ineffective for failing to raise on direct appeal in the Court of Appeals the full set of issues [the petitioner] presented in his federal habeas petition.
>
> V. This case presents a credible claim of actual evidence.
>
> VI. Judge Waterstone and Judge Sullivan have exhibited judicial bias in this case by violating [the petitioner's] Sixth and Fourteenth Amendment rights to a fair trial pursuant to the United States Constitution.

Pet.'s *Pro Se* Mot. for Leave to Appeal. The Michigan Court of Appeals denied the petitioner's motion to file the *pro se* application and denied leave to appeal. *People v. Szymanski*, No. 289940 (Mich. Ct. App. June 12, 2009).

-8-

The petitioner then filed a *pro se* application for leave to appeal in the Michigan Supreme Court. He raised the same claims raised in his motion for relief from judgment. The petitioner also filed a motion to supplement the record, alleging that the prosecution failed to disclose exculpatory material and that the expert testimony presented at trial was perjured. The Michigan Supreme Court denied leave to appeal. *People v. Szymanski,* 485 Mich. 1074, 777 N.W.2d 177 (2010) (table).

## C.

The pending habeas proceeding was reopened and the petitioner filed a second amended petition on February 5, 2010. In the second amended petition, the petitioner incorporates the arguments made in the motions for relief from judgment and for leave to appeal. In addition, the petition, read charitably, raises the following claims: (i) the prosecution's use of false and misleading testimony that the wound on the front of the complainant's arm was a contact wound denied the petitioner a fair trial; (ii) the prosecution suppressed the complainant's medical records; (iii) the prosecutor suborned false and misleading testimony from the gunshot residue expert; (iv) Officer Kappel's preliminary complaint report was back-dated and fabricated; (v) the trial court made an unreasonable determination of the facts in its order denying the petitioner's motion for relief from judgment where the court referred to the petitioner's testimony, but the petitioner did not testify at trial; (vi) the prosecutor withheld evidence relevant to the credibility of witness Steiner; (vii) the trial court erred in failing to provide the petitioner with gunshot residue, gunshot wound, and blood alcohol experts; and (viii) the trial court violated the petitioner's rights under the Confrontation Clause when it permitted the prosecution to introduce the petitioner's statement to a detective.

On March 26, 2010, the respondent filed a response to the petition arguing that most of the claims either are not exhausted in state court or barred because they were not preserved properly. The claims that are presented properly, says the respondent, are meritless.

The petitioner filed a reply on April 13, 2010.

Since filing his amended petition, the petitioner has filed several motions and supporting papers. On May 4, 2009, the petitioner filed a motion to supplement the record, which the Court granted. In his motion, the petitioner advances the arguments raised in his amended petition, and cites testimony by the gunshot expert in an unrelated case to support his argument that the expert committed perjury in his case. On January 28, 2011, the petitioner filed another motion to supplement the record, which also was granted by the Court. In that motion, the petitioner argues that the prosecution's attempt to obtain Elmore's jacket to use as evidence was misconduct, the prosecutor, investigator, and crime lab expert planted burn marks and gunpowder on the jacket, and the prosecution's failure to turn over the warrant prosecutor's notes was a *Brady* violation. The petitioner also argues that those notes demonstrate that the prosecution knew that the Gold Coast parking lot was used by men as a place to engage in sexual intercourse. He argues that the prosecution failed to prove that Elmore was in the lot because of a flat tire rather than to engage in public sexual intercourse and should have turned over that information to the petitioner because it bore on Elmore's credibility. On February 28, 2011, the petitioner filed an addendum to the motion reiterating the argument in the January 28, 2011 motion. Finally, on February 16, 2012, the petitioner filed a further motion to supplement the record in which he argued that the prosecutor suborned perjury by allowing Elmore to testify that he lived in Brownstown, while Elmore's hospital records stated that he lived in Flat Rock, as well as by soliciting testimony that there was only one

-10-

shot, when a draft case report states that several shots were fired.  The petitioner also argues that if he had shot Elmore, it might have been justified as part of a citizen's arrest or to stop Elmore from fleeing, based on the petitioner's belief that Elmore was engaging in public sexual intercourse.

Two more motions are currently pending in the case.  On February 28, 2012, the petitioner filed a motion to review new evidence that the petitioner believes demonstrates that he is serving an invalid sentence.  The petitioner seeks to add  letters from the Michigan Department of Corrections Central Time Computation Unit indicating that the twenty-five-year maximum term of sentence imposed in this case is higher than the statutory mandatory maximum term for the offense of assault with intent to commit great bodily harm less than murder.  The letters indicate that the sentence would be appropriate if the petitioner was sentenced subject to a fourth habitual offender enhancement, but that was not indicated on the judgment.  The challenge to the sentence was never made in state court and is not properly before this Court.  The papers relating to the petitioner's claim that his sentence is illegal are irrelevant to any issue in the petition as amended.  Therefore, the Court will deny the motion to review new evidence.

On September 7, 2012, the petitioner filed a motion for relief for his transfer.  The petitioner states that he was transferred to Newbury Correctional Facility, located in Michigan's Upper Peninsula.  He argues that his property was searched on two occasions, and that on the second occasion matches were found in his possession.  He contends that the matches were planted in his property in order to provide a pretext for his transfer and requests that the Court order that he be transferred to a facility in Detroit.  This Court does not have the power to order that the petitioner be housed in a specific facility.  Nor is a habeas corpus proceeding the proper vehicle for raising the arguments that the petitioner raises in the motion.  Therefore, the Court will deny the motion.

-11-

D.

The petitioner has advanced a variety of arguments in multiple forums to support a claim for habeas corpus relief. In addition to his multiple state court filings, the petitioner has filed three habeas corpus petitions with this Court and numerous supplemental filings. Those filings do not systematically lay out the petitioner's claims, instead consisting of long paragraphs of often rambling and repetitive argument. Nor does the respondent's answer offer much illumination, as it addresses only those claims advanced by the petitioner's appellate counsel on direct appeal and by the petitioner in his motion for relief from judgment. The respondent's answer does not discuss the merits of those claims. Instead, the respondent argues that the majority of the petitioner's claims are procedurally defaulted. The respondent's argument may have merit. However, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Although a procedural bar may preclude relief, "[j]udicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of the petitioner's claims.

In reviewing the petitioner's various filings in this Court, the Court has identified eleven sets of arguments that the petitioner has advanced in support of his claim: (1) the petitioner's pre-arrest silence was used as evidence of his guilt in violation of the Fifth Amendment; (2) new evidence about Elmore's wound or gunshot residue; (3) evidence of Elmore's alleged intoxication the night of the incident; (4) *Brady* violations by both the prosecutor and the police; (5) allegations that the

-12-

prosecution suborned perjury or offered misleading testimony; (6) the petitioner's Sixth Amendment rights were violated when he was permitted to represent himself; (7) the petitioner's rights were violated when the state refused to provide him with experts to testify on his behalf; (8) the petitioner's rights were violated when the officer in charge of the investigation failed to locate one of the petitioner's witnesses; (9) various alleged errors on the part of the state courts; (10) ineffective assistance of appellate counsel; and (11)   admission of the petitioner's custodial statement violated his rights under Confrontation Clause.  The Court will address each in the context of the Antiterrorism and Effective Death Penalty Act.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel.  *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).  Under that review standard, mere error by the state court does not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable."  *Wiggins*, 539 U.S. at 520-21 (*quoting Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)).  Additionally, this Court must presume the correctness of state court

-13-

factual determinations.  28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409.  The Court has explained that an unreasonable application of federal law is different from an incorrect application of federal law.  Under that language, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Supreme Court has continued to emphasize the limited nature of this review.  In its recent unanimous decision in *Harrington v. Richter*, --- U.S. ---, 131 S.Ct. 770 (2011), the Court reiterated that the AEDPA requires federal habeas courts to review state court decisions with "deference and

-14-

latitude," and "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 785-86 (*quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, ---, 130 S.Ct. 1855, 1862 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, --- U.S. ---, 131 S.Ct. 1388, 1398 (2011).

A.

The petitioner claims that evidence of his pre-arrest silence was improperly used as substantive evidence of his guilt. The petitioner's custodial statement was read to the jury by Officer Brown. The petitioner objects to the admission of this portion of the statement:

> Q:    Why didn't you talk to the police about this incident that night?
> A.    Other employees advised me not to talk to the police and stay hidden. I don't want to mention any names.

Trial Tr., Sept. 11, 2003, at 158. The petitioner also objects to the prosecutor's use of that testimony in his closing argument, arguing that the prosecutor invited the jury to consider the plausibility of the petitioner's statement to police in light of his failure to report the crime to police on the night of the shooting.

The petitioner first raised this argument on direct appeal. Because the petitioner did not object to the prosecutor's statements at trial, the Michigan Court of Appeals reviewed the claim for plain error and held that the question and the prosecutor's comments did not violate the petitioner's right against self-incrimination:

> The right against self-incrimination prohibits a prosecutor from commenting upon a defendant's silence in the face of an accusation. *People v. Lawton*, 196 Mich. App 341, 353; 492 N.W.2d 810 (1992). However, the right is not implicated when the silence occurred before any police contact. *Id*. Thus, a prosecutor may comment on a defendant's failure to report a crime when reporting the crime would have been natural if the defendant's version of the events were true. *Id*.
>
> Here, Investigator Brown testified with respect to a voluntary statement given by defendant after *Miranda* warnings were provided. On appeal, defendant objects for the first time to the following colloquy between Brown and defendant during the interrogation as presented to the jury: "Question: Why didn't you talk to the police about this incident that night? Answer: Other employees advised me not to talk to the police and stay hidden. I don't want to mention any names." Defendant also objects for the first time to the prosecutor's subsequent commentary during his

-16-

closing argument, in which he stated, "But he didn't think it was important to tell his version of what happened to the police. . . . If he was a victim of a crime . . . how come he didn't take the opportunity to tell the police?"

The prosecutor was commenting on defendant's pre-arrest failure to talk to or contact the police. This silence is being offered to show that the version of events that defendant reported to Brown are probably not true, because if defendant's version were true, defendant would have reported the events to the police on the night of the incident. Therefore, pursuant to *Lawton*, the prosecution's comments about defendant's silence did not violate defendant's constitutional right against self-incrimination because the prosecutor was referencing defendant's pre-arrest/pre-*Miranda* silence. Thus, the trial court's failure to suppress sua sponte Brown's testimony or the prosecutor's subsequent comments during his closing argument did not constitute plain error.

*People v. Szymanski*, No. 252378, 2005 WL 562822, at *1 (Mich. Ct. App. Mar. 10, 2005).

The Supreme Court has held that evidence of post-*Miranda* warning silence violates a defendant's Fifth Amendment rights, *Doyle v. Ohio*, 426 U.S. 610, 617 (1976), but evidence of pre-warning silence does not, *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980). Although the Sixth Circuit has held that the use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination, see *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), there is no clearly established Supreme Court precedent establishing a constitutional bar to using a defendant's pre-arrest, pre-*Miranda* silence as evidence of guilt. As the Sixth Circuit has acknowledged, federal courts have reached different conclusions regarding the use of a defendant's pre-arrest silence:

The circuits that have considered whether the government may comment on a defendant's prearrest silence in its case in chief are equally divided. Three circuits have held that such use violates the privilege against self-incrimination found in the Fifth Amendment, relying principally upon *Griffin* [*v. California*, 380 U.S. 609, 615 (1965)]. *See United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1017 (7th Cir. 1987); *Coppola v. Powell*, 878 F.2d 1562, 1568 (1st Cir.), *cert. denied*, 493 U.S. 969 (1989); *United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991), *cert. denied*, 503 U.S. 997 (1992); *cf. United States v. Caro*, 637 F.2d 869, 876 (2d Cir. 1981) ("Whatever the future impact of *Jenkins* may be, we have found no decision

-17-

permitting the use of silence, even the silence of a suspect who has been given no *Miranda* warnings and is entitled to none, as part of the Government's direct case."; "[W]e are not confident that *Jenkins* permits even evidence that a suspect remained silent before he was arrested or taken into custody to be used in the Government's case in chief."). . . .

Three circuits, on the other hand, have reached the opposite conclusion. *See United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991); *United States v. Zanabria*, 74 F.3d 590, 593 (5th Cir. 1996); *United States v. Oplinger*, 150 F.3d 1061, 1066-67 (9th Cir. 1998).

*Combs*, 205 F.3d at 282-83.  Because there is no clearly established Supreme Court precedent requiring the suppression of pre-arrest silence, the Court concludes that the state court's decision was not contrary to or an unreasonable application of clearly established federal law and therefore that the petitioner's claim does not provide grounds for a writ of habeas corpus.

### B.

The next set of claims deals with the contention that there is new evidence demonstrating that the wound described as an entrance wound at trial was actually an exit would.  The petitioner challenges testimony that the gunshot wound on the front of Elmore's arm was a contact wound and that it was an entrance wound rather than an exit wound.  He argues that new evidence demonstrates that the purported entrance wound was actually an exit wound, the police officers who testified were not gunshot wound experts, the prosecution's use of this testimony was misleading, and the testimony was perjury knowingly suborned by the prosecutor.  The petitioner also asserts that the government suppressed this evidence.  The trial court, the last state court to issue a reasoned opinion on any of these claims, denied relief, writing:

No evidence has been presented in this motion which would suggest the entrance and exit wounds were reversed. Szymanski cites a medical treatise to ostensibly contradict the testimony of trial to show Elmore's view of where he was shot was reversed.  The issue in this case, however, was the identification of the perpetrator. Elmore testified that Szymanski shot him. Szymanski did not say – nor see – how

-18-

Elmore was shot according to his own testimony.  That the physical evidence could contradict Elmore's testimony, and hence, undermine his credibility is unsupported by any fact of record.

Moreover, Chemist William Steiner testified that there were two holes in Elmore's jacket.  The hole on the left sleeve of the coat was a contact wound and hence an entrance wound.  Steiner based this conclusion on the shape of the hole in the coat and the stippling and soot on the coat around the hole, which emanated from the gun barrel.  Steiner could not opine whether the other hole in the coat was either an entrance or an exit wound.

It would be a novel scientific fact that stip[p]ling be found on an exit wound.  The defendant's argument as to this hole is without merit and without support.  Steiner could not opine as to whether the second hold was an exit or entrance wound, so no testimony was given about it.

*People v. Szymanski*, No. 03-004408-01, at 13-14 (Wayne Cnty. Cir. Ct. June 12, 2008).

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976).  That is true whether the false testimony goes to the defendant's guilt or to a witness's credibility, and it does not matter whether the prosecution directly elicits the false testimony or merely allows false testimony to go uncorrected.  *Napue v. Illinois*, 360 U.S. 264, 270-72 (1959).  But mere inconsistences in witness testimony do not establish the government's knowing use of false testimony.  *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987).  "[N]ot every testimonial inconsistency that goes uncorrected by the government establishes a constitutional violation."  *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990).  Therefore, to establish relief on his false testimony claim, the petitioner "must show (1) that the prosecution presented false testimony (2) that the prosecution knew was false, and (3) that was material."  *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005).  "Moreover, the [petitioner] must show that the statement in question was 'indisputably

false,' rather than merely misleading." *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000) (quoting *United States v. Lochmondy*, 890 F.2d 817, 823 (6th Cir. 1989)).

In support of his claim that the testimony was false, the petitioner submits various excerpts from a treatise on scientific evidence and an excerpt from the trial testimony of a forensic chemist in an unrelated case. That material apparently constitutes the "new evidence" demonstrating that the gunshot wound was an exit rather than an entrance wound. Even assuming that the information contained in those brief excerpts contradicted the testimony in this case — and it is far from clear that it does — that is a far cry from showing that the testimony was false. The evidence offered by the petitioner does not directly address or interpret the physical evidence presented in this case. The petitioner's lay interpretation of those brief excerpts is insufficient to meet the petitioner's burden to demonstrate the falsity of the gunshot wound and residue testimony. The trial court's finding that the prosecution did not present false evidence in this regard was a reasonable interpretation of the facts of the case.

The petitioner also takes issue with the fact that police officers testified at trial that Elmore's gunshot wound had tattooing characteristic of a close contact gunshot wound despite their not being qualified as expert witnesses. That claim of error addresses a state evidentiary rule, which does not amount to a ground for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993). Only where admission of the disputed evidence rendered the trial "so fundamentally unfair as to deprive the petitioner of due process" does it provide grounds for granting a writ of habeas corpus. *Broom v. Mitchell*, 441 F.3d 392, 406 (6th Cir. 2006) (quoting *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004)). "[S]tate-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some

principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996). Even if some rule of evidence was violated, relief on collateral review will be provided "only when a trial error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Ford v. Curtis*, 277 F.3d 806, 809 (6th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). The police officers' testimony that Elmore's wound appeared to be a contact wound was based on experience. Moreover, an individual who was qualified as a gunshot residue expert — William Stiener — also testified that the wound was a contact wound. The petitioner has not demonstrated that the admission of the police officers' testimony, if it was error, had a "substantial and injurious effect" on the jury's verdict.

Finally, the petitioner argues that the government suppressed the "new evidence" in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). However, the expert testimony that the petitioner presents was given in March 2006, nearly three years after the petitioner's trial. The government cannot have suppressed evidence that did not yet exist. And there is nothing to suggest that the treatise on scientific evidence was not publicly available. Even assuming that this evidence actually was favorable to the petitioner, where such evidence is publicly available, the prosecution is under no duty to disclose that information to the defense. *See Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007) ("Where, like here, 'the factual basis' for a claim is 'reasonably available to' the petitioner or his counsel from another source, the government is under no duty to supply that information to the defense."); *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (finding that there is no *Brady* violation where information is available to the defense "because in such cases there is really nothing for the government to disclose").

The Court concludes that the petitioner's claims surrounding the testimony at trial as to the gunshot wound, alleged new evidence regarding the wound, and the alleged *Brady* violation resulting from the government's failure to disclose that new evidence do not entitle the petitioner to habeas relief.

C.

The next set of claims in the petitioner's filings arises from the petitioner's contention that there is new evidence demonstrating that Elmore was intoxicated at the time of the incident. The petitioner also asserts that the government suppressed that evidence and suborned perjury in permitting Elmore and others to testify at trial that Elmore was not intoxicated. The trial court, the last state court to issue a reasoned opinion on any of these claims, denied relief, writing:

> Szymanski claims there is a discrepancy between Elmore's lab results of his blood alcohol content (.10) and his description at trial of whether or not he was drunk. This evidence, defendant contends, was withheld by the State.
>
> Defendant's arguments are without merit. Elmore admitted at trial that he had three drinks, but felt or believed that he was able to drive. Szymanski claims the medical records show Elmore's blood alcohol was .10, the then legal threshold for being intoxicated, and the exact degree of intoxication was not in evidence. Regardless of what his blood alcohol content may have been, the fact that Elmore had been drinking was presented to the trier of fact. The fact he consumed three drinks in a short period of time was in the record and was not withheld from Szymanski nor the jury. The fact finder was free to draw a number of conclusions from these facts. The trier of fact observed Elmore as he testified. It is up to the finder of fact to make all determinations of credibility of the witness, including whether or not Elmore was drunk, and whether or not it affected his perception and memory, as well as his credibility.
>
> The State introduced the evidence, the fact Elmore consumed alcohol drinks, to wit, three in an hour. The State did not withhold this evidence and presented it in trial. What a fact finder could make of this evidence is a matter for development and argument at trial. The court is precluded from granting relief because this issue, if viable, could have been raised on appeal.

*People v. Szymanski*, No. 03-004408-01, at 12 (Wayne Cnty. Cir. Ct. June 12, 2008).

The Court finds that the state court's resolution of this issue was neither contrary to nor an unreasonable application of clearly established federal law. The petitioner argues that the state's failure to turn over Elmore's lab results was a *Brady* violation. However, in order to prevail on a claim of a *Brady* violation, the petitioner must demonstrate that he was prejudiced by the state's failure to turn over the evidence. *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010). As the state court noted, the fact that Elmore had been drinking, and had drunk a significant number of drinks within a short period of time, was brought out at trial. The jury was free to consider that evidence and draw any reasonable conclusions from it. The petitioner has failed to demonstrate that he was prejudiced by the prosecution's failure to turn over the lab reports of Elmore's blood alcohol content, and his habeas claim on this basis fails.

The petitioner also objects to testimony by Elmore that he was not intoxicated on the night of the incident and to testimony by officers present at the scene that Elmore did not appear intoxicated. Elmore testified as follows:

> Q. Now you had consumed approximately three drinks?
> A. Correct.
> Q. Do you recall if they were served in a glass, in a can?
> A. In a glass.
> Q. And after you had consumed those three drinks, how did you feel after ingesting those three drinks?
> A. Fine.
> Q. Did you feel like you were not able to drive?
> A. No.
> Q. Did you feel that maybe you were intoxicated?
> A. No.
> Q. You sure about that?
> A. I'm positive.

Trial Tr., Sept. 11, 2003, at 23. Officer Kappel testified as follows:

> Q. And I take it prior to October 22nd of last year, there were times that you come in contact with people that you suspected had consumed alcohol, is that right?

-23-

A.  That's correct.
Q.  Are you familiar with the kind of characteristics they would demonstrate if they were intoxicated?
A.  Yes.
Q.  Was Mr. Elmore demonstrating anything to lead you to believe that in fact he was intoxicated?
A.  Not at all.

Trial Tr., Sept. 11, 2003, at 94.  Officer Guntzviller testified as follows:

Q.  Sir, as a police officer, have you come in contact with people that you suspected had ingested alcohol?
A.  Yes.
Q.  Are you familiar — do you think you're familiar with the characteristics they might demonstrate?
A.  Quite familiar, yes.
Q.  Was there anything about Mr. Elmore's demeanor that would lead you to believe that he was either intoxicated or drunk?
A.  He didn't appear to me at all to be impaired.

Trial Tr., Sept. 11, 2003, at 109-110.

As discussed above, the petitioner has asserted that Elmore's blood alcohol content was .10 mg./decl., then the legal limit for intoxication.  Assuming that to be true, it does not demonstrate that either Elmore's testimony or the officers' testimony at trial was false.  Elmore's testimony focused on whether Elmore believed himself to be intoxicated and whether Elmore believed he was able to drive; the officers' testimony was focused on whether the Elmore was acting in a way that led them to believe Elmore was intoxicated some time after the shooting.  Evidence that Elmore actually was intoxicated does not render this testimony false.  Nor has the petitioner demonstrated that the testimony was material.  As discussed above, the jury heard testimony that Elmore had consumed three alcoholic beverages in a short period of time.  The jury was free to draw conclusions as to Elmore's credibility and state of sobriety based on that testimony.  The petitioner's claim fails.

-24-

D.

Next, the petitioner raises a few more challenges based on *Brady v. Maryland*. He argues that his right of confrontation was violated because the police report he received was redacted, blocking out Elmore's address. He argues that the failure to disclose that information violated *Brady* because the prosecution questioned Elmore about the return address on a letter sent to a witness in the case offering the witness money in exchange for helping Elmore convict the petitioner, and Elmore's address as listed on the police report could have been useful in impeaching him on that point. The petitioner also argues that the following pieces of evidence or facts were "suppressed" by the government: William Steiner replaced Hayden Dannug as a state witness; patrons of the Gold Coast Bar used the parking lot as a location to engage in sexual intercourse; all prior bad acts of police officer witnesses; Elmore's medical records; evidence relevant to Steiner's credibility; the warrant prosecutor's notes; a statement to the police made by Elmore; and a draft case report. The Court views these claims as *Brady* challenges.

The Due Process Clause requires the state to disclose to the defense favorable evidence that is material to guilt or punishment. *Brady*, 373 U.S. at 87. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). A prosecutor has a duty to learn of favorable evidence in the possession of others acting on the state's behalf, including the police. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Exculpatory evidence includes evidence that may be used to impeach the state's witnesses. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Therefore, "[a] successful *Brady* claim requires a three-part showing: (1) that the evidence in question be favorable; (2) that the state suppressed the relevant evidence, either purposefully or inadvertently; (3) and that the state's actions resulted in prejudice." *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010) (quoting *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008)); *see also In re Siggers*, 615 F.3d 477, 480 (6th Cir. 2010). The petitioner bears the burden of establishing each of these three elements. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

The petitioner's first *Brady* claim involves the redaction of Elmore's address from a police report. Appearing to construe the issue, at least in part, as a Confrontation Clause challenge, the Michigan Court of Appeals found no plain error in the redaction of Elmore's address:

> A defendant's constitutional right to confront a witness is violated when unreasonable limitations are placed on his opportunity to test the truthfulness of the witness' testimony. *People v. Ho*, 231 Mich. App 178, 189-190; 585 N.W.2d 357 (1998). A criminal defendant has a due process right to access certain information possessed by the prosecution. *People v. Lester*, 232 Mich. App 262, 281; 591 N.W.2d 267 (1998). This includes information that could be used to impeach a witness. *Id.* The prosecution is under a duty to disclose any information that would materially affect the credibility of his witness. *Id.*

> Here, defendant cross-examined Elmore without limitation, and he could have further cross-examined Elmore regarding specifics and details as to Elmore's place of residence in relation to the return address on the letter written to Lisa Burleson. Defendant could also have questioned others about Elmore's address. Elmore testified that he did not live in the area of the return address listed on the letter. Defendant is apparently speculating that the address for Elmore listed in the police report matched the return address on the letter, otherwise there could be no claim of materiality. Assuming this to be true, despite the lack of any evidence in support, the undisclosed/redacted information from the police report would not have materially affected Elmore's credibility because anyone could have written the letter and put Elmore's address on it. Moreover, there is no indication that the address was redacted in an attempt to prevent defendant from acquiring information damaging to Elmore's credibility. Even if the return address on the letter to Burleson from "J.D." was identical to Elmore's address, because Elmore testified that he never went by "J.D.," that he did not know Burleson's address, and because defendant did know Lisa's address, a reasonable juror could conclude that defendant wrote or had someone else write the letter from "J.D." to Burleson. Therefore, the trial court did

not commit plain error when it failed to rule sua sponte that defendant was denied his due process rights when he received a police report that had redacted Elmore's address.

*People v. Szymanski*, No. 252378, 2005 WL 562822, at *2 (Mich. Ct. App. Mar. 0, 2005).

Despite the court of appeals' interpretation of the petitioner's argument, it is clear from the petitioner's brief on appeal that he seeks to advance an argument based on *Brady*. The petitioner argues, essentially, that the prosecution suppressed Elmore's address on the police report and that the address on the report matched the return address on the letter written to Lisa Burleson. This claim fails because the petitioner has not established that the suppressed evidence was favorable to him; i.e., that the effaced address matched the return address on the letter. The argument is based solely on the petitioner's speculation. Speculation and conclusory allegations are insufficient to meet the petitioner's burden of demonstrating materiality for the purposes of *Brady*. The petitioner's claim fails.

The petitioner advances a number of other *Brady* arguments, none of which have merit. He argues that a "case draft" prepared by the police was suppressed. That case draft contained a statement by Elmore to the effect that he was shot several times by an unknown perpetrator, who then fled. However, the petitioner cannot demonstrate either that the state "suppressed" this piece of evidence or that the petitioner was prejudiced, because the petitioner apparently possessed the case draft at the time of trial and questioned Officer Guntzviller on its contents. *See* Trial Tr., Sept. 11, 2003 at 117-19. Similarly, the petitioner argues that the state suppressed the warrant prosecutor's notes. The petitioner has pointed to nothing in the warrant prosecutor's notes that would constitute evidence favorable to him. The claim fails.

-27-

The petitioner argues that the state suppressed evidence that Elmore was shot by an individual named Adam. In support of that contention, the petitioner cites a section of the trial transcript in which Elmore responds to the question "What do you do next?" by stating "I just looked at Adam and said why the heck did you do that." Trial Tr. Sept. 11, 2003 at 44. That testimony was immediately preceded by Elmore's testimony that the only people in the parking lot were himself, the petitioner, and a parking attendant. Because this evidence actually was presented at trial, the petitioner cannot demonstrate either that the state suppressed the evidence or that the petitioner suffered prejudice. The petitioner's claim fails.

The petitioner contends that the state suppressed evidence that Gold Coast patrons had sex in the parking lot. The petitioner argues that the information would have been favorable to him because he might have argued at trial that he shot Elmore in an attempt to make a citizen's arrest for public indecency. Not so. There is no evidence that Elmore was so engaged. Moreover, as discussed above, the prosecution is not required to turn over information that is already available to the defense. *See Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007) ("Where, like here, 'the factual basis' for a claim is 'reasonably available to' the petitioner or his counsel from another source, the government is under no duty to supply that information to the defense."); *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (finding that there is no *Brady* violation where information is available to the defense "because in such cases there is really nothing for the government to disclose"). As the petitioner notes, the staff of the Gold Coast, which included the petitioner, was aware that patrons used the parking lot to have sex. Further, if the petitioner shot Elmore because he observed Elmore committing an act of public indecency, as the petitioner suggests, presumably

-28-

the petitioner was aware of the factual basis underlying that theory.  The petitioner was free to advance that theory at trial; he did not.  The claim fails.

The petitioner argues that the prosecution suppressed the fact that William Steiner replaced another individual as an expert witness. However, the petitioner explains neither the materiality of that "evidence" nor how he was prejudiced by its alleged suppression beyond a general allegation that it impaired his ability to impeach Steiner.  The petitioner's claim fails.

The petitioner next argues that the prosecutor withheld a medical record that indicated that the gunshot was a close range wound, rather than a contact wound.  That medical record, he argues, would have supported his defense that a third individual was in the parking lot and fired the gunshots.  The petitioner's argument is based on his contention that there is a conflict between testimony at trial that Elmore's wound was a contact wound and Elmore's hospital admission record, which indicates that Elmore was less than ten feet from the assailant.  Any apparent conflict between those pieces of evidence, however, is explained by the fact that the admission record provides three options for the victim's distance from the assailant, of which "< 10 feet" is the shortest.  The admission record, therefore, is not inconsistent with that testimony, and the petitioner has failed to demonstrate prejudice.  The claim fails.

The petitioner accuses the government of withholding evidence of William Steiner's bias and evidence of prior perjury or dishonesty by the police officers who testified in this case.  However, the petitioner fails to identify specific evidence that was withheld on these issues, or indeed to demonstrate that such evidence even exists.  Those claims likewise fail.

Finally, the petitioner, in a supplemental filing, appears to argue that the prosecutor violated *Brady* by participating in the investigation in this case by, for example, requesting that lab work be

-29-

done on Elmore's jacket. The petitioner also makes various allegations, all of them entirely unsubstantiated, that the prosecutor or William Steiner planted or fabricated evidence. The petitioner's allegations do not make out a viable *Brady* claim. Nor do they present any other basis upon which the Court could grant the petitioner habeas corpus relief.

E.

The petitioner next argues in another context that the prosecution suborned perjury at trial. The petitioner challenges testimony by Elmore that he lived in Brownstown and testimony that there were no reports of several shots rather than one shot were fired. As discussed above, to establish an entitlement to relief on his false testimony claim, the petitioner "must show (1) that the prosecution presented false testimony (2) that the prosecution knew was [indisputably] false, and (3) that was material." *Abdus-Samad*, 420 F.3d at 625-26; *Byrd*, 209 F.3d at 517 (quoting *Lochmondy*, 890 F.2d at 823).

The petitioner argues that the prosecutor suborned perjury when he permitted Elmore to testify that he lived in Brownstown, rather than Flat Rock. In support of this argument, the petitioner presents a redacted hospital admission report from the night of the incident. The petitioner argues that although Elmore's address is redacted, "Flat Rock" is visible. The Court has examined the admission report and is unable to discern the words "Flat Rock" on any part of the record. The petitioner also presents the Wayne County Prosecuting Attorney's warrant recommendation, which lists Elmore as living in Flat Rock. However, that is also insufficient to demonstrate that Elmore lived in Flat Rock rather than Brownstown and therefore that Elmore's testimony was false. The warrant recommendation states that Elmore's address was 23206 Telegraph Road; a review of area maps demonstrates that address is located in Brownstown, rather than Flat Rock. Further, the fact

-30-

that the warrant prosecutor's notes list Flat Rock rather than Brownstown as Elmore's city of residence does not demonstrate that it is the notes, rather than Elmore's testimony, that is accurate. The petitioner has not met his burden of demonstrating that Elmore's testimony was false.

The petitioner also argues that the prosecutor elicited false testimony from Officer Guntzviller about the contents of a case draft report prepared by a member of the City of Detroit Homicide Department. That case draft report stated that several shots were fired. Officer Guntzviller testified as follows:

> Q. Do you know where this information came from contained in the case draft?
> A. The information that was written down here was given to the Homicide section by myself. I was the one who notified them.
> Q. Did you use the word several shots?
> A. I don't recall that, no.
> Q. I mean you've got a copy of your partner's report, right?
> A. Yes.
> Q. Is there any mention in that report, that PCR that there were several shots.
> A. No, sir.
> Q. After your conversation with the victim, were you of the mind set that there were several shots?
> A. I personally spoke with the victim and observed only one gunshot wound on him.
> Q. Do you know where that came from, several shots?
> A. I have no idea.

Trial Tr., Sept. 11, 2003 at 123-24. The petitioner characterizes this testimony as perjury, arguing that there was a report that several gunshots were fired and pointing to the case draft report as evidence to support his claim. The petitioner's argument fails, however, because he has not demonstrated that Officer Guntzviller's testimony was not truthful. Officer Guntzviller testified, essentially, that the case draft report contained an error. The petitioner has brought forward no evidence other than the report itself to suggest that Officer Guntzviller's testimony was false; the petitioner has not, for example, produced any other evidence to suggest that several shots actually

were fired or that Officer Guntzviller actually did report that several shots had been fired.  The petitioner's habeas claims on this point fail.

F.

The petitioner argues that his request to represent himself at trial was equivocal and that the trial court's acceptance of his request and failure to appoint substitute counsel violated his right to due process.  In his motion for leave to appeal the trial court's ruling on his motion for relief from judgment, the petitioner argued that the trial court failed to comply with the procedure in *Faretta v. California*, 422 U.S. 806, 834-35 (1975).  In some of the petitioner's submissions, he also argued that he was forced to represent himself in violation of his right to counsel.  The Court will address all of the petitioner's arguments as to the propriety of his self-representation at trial together.

The trial court, the last state court to issue a reasoned decision on this issue, found that the petitioner's written motion and repeated oral requests to represent himself were unequivocal, and that the petitioner did not demonstrate good cause for his failure to raise the issue on appeal.  The trial court held:

> Szymanski states "red flags" required the court to ask whether Szymanski "really wanted", but failed to ask for a "different lawyer" rather than to represent himself. No authority in law is offered in support of this novel proposition.  Szymanski did not have conflicts with his standby counsel during trial and never alleged any facts to warrant either judge to ignore the requests he made in open court, before two different judges, to represent himself, a qualified right written in law.
>
> This argument is without merit.  There were no "red flags" in the written motion. Moreover, to rely exclusively on the written motion, and ignore defendant's repeated requests made in court where the court personally heard the argument, saw the defendant and interacted with him is to compartmentalize the motion process and reduce it to a meaningless, confused procedure.  The defendant seeks the court to ignore his oral arguments, as if not made, and this is not a valid argument.
>
> The court finds Szymanski's request to represent himself was definite.  It was orally made before two different judges of this court.  Not only did Szymanski put the

-32-

waiver on the record before Judge Waterstone, he also reaffirmed it before the trial judge before the commencement of his re-trial. After a detailed discussion of the dangers and requirements of law, Szymanski ultimately elected an option presented by the trial court, to have trial counsel assist him in trial by making and responding to legal objections and consulting with defendant during trial.

*People v. Szymanski*, No. 03-004408-01, at 7-8 (Wayne Cnty. Cir. Ct. June 12, 2008).

The Sixth Amendment guarantees a criminal defendant the right to represent himself in criminal proceedings. *Faretta v. California*, 422 U.S. 806, 834-35 (1975); *United States v. Jones*, 489 F.3d 243, 248 (6th Cir. 2007). But two conditions must be satisfied. First, the accused must "knowingly and intelligently" waive the right to counsel after having been apprised of "the dangers and disadvantages of self-representation." *Faretta*, 422 U.S. at 835. Second, a defendant's request for self-representation must be made clearly and unequivocally. *Raulerson v. Wainwright*, 469 U.S. 966, 969-70 (1984); *United States v. Martin*, 25 F.3d 293, 295 (6th Cir. 1995). It is the petitioner's burden to demonstrate that his waiver of the right to counsel was not knowing, voluntary, and intelligent. *Akins v. Easterling*, 648 F.3d 380, 395 (6th Cir. 2011).

In open court, the petitioner clearly asked to represent himself. On August 22, 2003, the petitioner filed a motion entitled "Motion to Allow Defendant to Represent Himself at Trial." The motion cited unspecified conflicts with the petitioner's lawyer, indicated that the petitioner wished to conduct direct and cross-examination and give opening and closing statements, and referenced the constitutional right to defend oneself at trial. At a hearing held on August 29, 2003, the following exchanges occurred:

> The Court: So, it is your position that you want to represent yourself and have Mr. Slameka just be an advisor?
>
> Mr. Szymanski: That's correct, Your Honor.
> . . .

> The Court: And earlier I heard a motion when [the prosecutor] was not present to allow the defendant to represent himself which is contained in one of his numerous motions that he filed with the Court. I did query him extensively about his understanding of the evidentiary rules, his knowledge that he is entitled to an attorney, that many people have fought for the right for him to have an attorney, but that he has a right to defend himself. And I reminded him of the fact that he's not intimately familiar with the Court rules and the rules of evidence. I also reminded him that he was not familiar with some of the ins and out [sic] of jury selection. And he insisted that with all of those he wanted to represent himself. And that's fine. But what I did not go over with him and I want to do this now: Mr. Szymanski, I want you to please raise your right hand. (The defendant is sworn.) So I kind of summarized all of the things you said earlier; is that correct?
>
> Mr. Szymanski: That's correct.
>
> The Court: And you would agree with my summary?
>
> Mr. Szymanski: Yes, Your Honor.
>
> The Court: All right. And I'm not misquoting you when I give your answers when I indicated that you have discussed all of those things with me and your answer was you still wanted to represent yourself?
>
> Mr. Szymanski: Yes, Your Honor.

Hr'g Tr., Aug. 29, 2003, at 7, 10-12. The trial court judge explained to the petitioner that in the court's estimation the petitioner was ill-equipped to represent himself and that he lacked sufficient understanding of the law to do so. After advising the petitioner of his rights and informing him of the dangers of self-representation and of the charges against him and the possible penalties stemming from those charges, the trial court allowed the petitioner to represent himself, and designated appointed defense counsel as standby counsel. During that colloquy, the petitioner expressed no dissatisfaction with his attorney nor did he request substitute counsel. In light of those facts, the Court cannot find that the trial court erred in permitting the petitioner to exercise his right to represent himself at trial. Nor are there any grounds upon which the Court could find that the

petitioner was forced to represent himself.  The state court's determination here faithfully tracked federal constitutional law.  *Akins v. Easterling*, 648 F.3d 380 (6th Cir. 2011).

G.

The petitioner alleges that his stand-by counsel failed to subpoena witnesses and the trial judge failed to sign orders compelling defense witnesses to testify.  The petitioner argues that these failures interfered with his right to defend himself.  The petitioner also argues that the trial court violated his right to present a defense by denying his request for a bullet wound expert, gunshot residue expert, and blood alcohol expert

The petitioner's argument that he is entitled to habeas relief because his stand-by counsel was ineffective has no merit.  As discussed above, the petitioner clearly elected to represent himself. As the Sixth Circuit has noted, where a petitioner waives his right to counsel,

> [his] claim of ineffective assistance of trial counsel necessarily fails.  By exercising his constitutional right to present his own defense, a defendant necessarily waives his constitutional right to be represented by counsel.  *See Faretta*, 422 U.S. at 834. Logically, a defendant cannot waive his right to counsel and then complain about the quality of his own defense.  *Id*. at 834 n. 46; *Gall v. Parker*, 231 F.3d 265, 320 (6th Cir. 2000).

*Wilson v. Parker*, 515 F.3d 682, 696 (6th Cir. 2008); *see also United States v. Ross*, 703 F.3d 856, 882 (6th Cir. 2012).  "To the extent that [stand-by counsel] failed to act during trial, [the petitioner] merely suffered the consequences of his decision to proceed *pro se*."  *Id*. at 697.  The petitioner's claim on this basis fails.

The petitioner also argues that he was denied his right to self-representation when the trial court failed to compel witnesses to testify on his behalf and denied his request for various experts. The Compulsory Process Clause of the Sixth Amendment provides an accused with the right to "compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, a crucial part of

-35-

the Constitution's more basic guarantee of "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). As applied to the states by the Due Process Clause of the Fourteenth Amendment, the accused has the right at trial to present testimony that is "relevant," "material," and "vital to the defense." *Washington v. Texas*, 388 U.S. 14, 17, 23 (1967); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (internal citations omitted)).

However, as the Supreme Court has explained, "more than mere absence of testimony is necessary to establish a violation of the right [to compulsory process]." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 866 (1982). The Sixth Amendment does not provide a defendant the right to process for obtaining any witness, only "witnesses in his favor." U.S. Const. amend. VI. "This language suggests that [a defendant] cannot establish a violation of his constitutional right to compulsory process merely by showing that [he was deprived of witnesses' testimony]. He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *Valenzuela-Bernal*, 458 U.S. at 867. In this case, the petitioner has neither identified witnesses who he believes should have testified at trial nor shown what material, favorable evidence those witnesses would have provided. The petitioner's claim therefore fails.

## H.

The petitioner next argues that he is entitled to habeas relief on the basis of a series of errors by the state court. The petitioner alleges that the trial court erroneously admitted a letter addressed to Lisa Burleson, the trial court made an unreasonable determination of the facts in deciding his

-36-

motion for relief from judgment, the trial court judge engaged in an improper *ex parte* conversation with a juror, the trial court judges were biased against the petitioner, and the Michigan Court of Appeals erroneously applied the harmless error standard of review.  The Court concludes that none of the petitioner's arguments entitle him to a writ of habeas corpus.

### 1.  Admission of letter to Burleson

The petitioner claims that the trial court improperly admitted as evidence a letter purportedly written by him to Lisa Burleson.  Burleson, a Gold Coast manager who testified at the first trial, testified that following the first trial, she received a letter in June 2003 bearing a return address of the county jail.  The letter read:

> Lisa, it is a mistrial, therefore you'll be called again.  It is suggested that you plead in the 5th Amendment at the second go around for the following reason.  Perjury. We left the bar together.  The testimony is that you didn't see me again.  If they offer you immunity, just state that you can't remember or can't recall.  This is to protect your interest.  Also you have the option of returning the prosecution's letter by marking, not here.  They'll keep calling you and JR as they need you to place me in close proximity to the faggot.  Please do not misinterpret this letter.  I absolutely mean you no harm.  Also give the enclosed letter to JR.  Thank you for your attention in this regard.  Cordially, E.  Please let me know if you and JR are going to follow this advice.  P.S.S.  You can send me a cryptic letter through an enclosure, third party, I'll understand.

Trial Tr., Sept. 10, 2003, at 216-17.  The petitioner argues that the letter was not properly authenticated because no witness testified as to the handwriting and no sample of the petitioner's handwriting was offered for the trial court to compare and evaluate.

The Michigan Court of Appeals reviewed the allegation of error for an abuse of discretion and held that held that although the evidence was not properly admitted under state evidence law, the error was harmless because sufficient evidence was presented to convict defendant absent the letter:

To be properly authenticated, the evidence must establish that the proffered matter in question is what its proponent claims. MRE 901(a); *People v. Howard*, 226 Mich. App 528, 553; 575 N.W.2d 16 (1997). A document may be authenticated by testimony from a witness with knowledge "that a matter is what it is claimed to be." MRE 901(b)(1). Additionally, authentication of a writing may be based on "[n]onexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation." MRE 901(b)(2). Furthermore, authentication can be satisfied by a comparison by the trier of fact with handwriting specimens, which have been authenticated, or by the distinctive characteristics contained in the letter itself, taken in conjunction with other circumstances. MRE 901(b)(3) and (4); *People v. Martin*, 150 Mich. App. 630, 637-638; 389 N.W.2d 713 (1986). The methods of authentication or identification in MRE 901(b) are presented "[b]y way of illustration only, and not by way of limitation[.]" MRE 901(b).

Here, Burleson was not familiar with defendant's handwriting as she had never seen it before. Furthermore, there were no comparisons to handwritten specimens of defendant, nor was a witness brought in who could identify the handwriting as that of defendant. Though defendant knew Burleson's address because he had previously dated her, and the letter contained defendant's name and prison address as the return address and was signed "E," Burleson did not testify to any distinctive characteristics in the letter that would prove that the letter was actually written by defendant, i.e., the letter did not contain specific information that only defendant would have known about. There was no evidence indicating that Burleson's address was unlisted or that the jail address was not ascertainable. The possibility remains that someone else could have written the letter and put defendant's name and return address on it. Therefore, we find that the trial court improperly admitted the letter.

However, because there was sufficient evidence to convict defendant without the improper evidence, we find that the error was not outcome determinative. The evidence reflects that Rodney Williams and Burleson saw a man wearing a black leather jacket walking toward Elmore, that defendant, who was wearing a black leather jacket, approached Elmore in an angry manner telling him to leave the parking lot, that Elmore and defendant started scuffling, and that defendant shot Elmore. All testifying witnesses heard a gun shot, Elmore indeed suffered a gunshot wound, and Williams and Elmore, who were in the parking lot, said that no one else was present. Therefore, any error was harmless and reversal is not required.

*People v. Szymanski*, No. 252378, 2005 WL 562822, at *3-4 (Mich. Ct. App. Mar. 10, 2005).

As discussed above, trial court errors in the application of state evidentiary law generally are not cognizable as grounds for federal habeas relief. *Estelle*, 502 U.S. at 67-68; *Serra*, 4 F.3d at 1354. Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental

-38-

fairness," may it violate due process and warrant federal habeas relief. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see also Clemmons v. Sowders*, 34 F.3d 352, 356 (6th Cir. 1994).

The Supreme Court has not held that the admission of improperly authenticated evidence offends a fundamental principle of justice. Nor is the Court prepared to find that the admission of the letter resulted in a denial of fundamental fairness, when considered in light of the substantial evidence that implicated the petitioner in the crimes. This case stands in contrast to *Ege v. Yukins*, 485 F.3d 364 (6th Cir. 2007). In *Ege*, a writ of habeas corpus was granted because the admission of bite mark testimony that lacked scientific evidence in a murder trial deprived the petitioner of a fundamentally fair trial. *Id*. at 374-78. The bite mark testimony, identifying the petitioner as the only person among the 3.5 millions residents of the Detroit metropolitan area who could have made the mark, was likely false and highly prejudicial. Additionally, the non-bite-mark testimony was all circumstantial evidence, none of which placed the petitioner at the scene of the crime. In this case, the improperly-admitted letter was never identified with any certainty as having been authored by the petitioner. The letter, while suspicious, did not directly implicate the petitioner in the shooting. And, most importantly, the non-letter testimony implicating the petitioner was strong. The petitioner was engaged in an altercation with Elmore when the shooting occurred and hid from police after the shooting. The admission of the letter did not render the petitioner's trial fundamentally unfair, and the Court will deny habeas relief on this claim.

2. Unreasonable determination of the facts

Next, the petitioner argues that the trial court judge made an unreasonable determination of the facts in denying his motion for relief from judgment when he wrote that the petitioner testified at trial. Not so. Although the trial judge did write that the petitioner "testified . . . at trial," *People*

*v. Szymanski*, No. 03-004408-01, at 13-14 (Wayne Cnty. Cir. Ct. June 12, 2008), that reference could easily have been to the evidence of the petitioner's statement to the police. Moreover, "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was based on" that unreasonable determination. *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). The petitioner's statement to Officer Brown, read into the record at the second trial, contains the information referenced in the trial court's opinion: that the petitioner claimed to have heard a shot when he and Elmore were fighting and to have heard a second shot when he was hiding behind a dumpster. The trial court's opinion relied on this information, not on the incorrect statement that the petitioner testified, in reaching its decision. Thus, while the state court made a factual error, its holding was not "based on" the error.

Next, the petitioner objects to the trial court's finding regarding the entrance and exit wounds:

> No evidence has been presented in this motion which would suggest the entrance and exit wounds were reversed. Szymanski cites a medical treatise to ostensibly contradict the testimony of trial to show Elmore's view of where he was shot was reversed. The issue in this case, however, was the identification of the perpetrator. Elmore testified that Szymanski shot him. Szymanski did not say – nor see- how Elmore was shot according to his own testimony. That the physical evidence could contradict Elmore's testimony, and hence, undermine his credibility is unsupported by any fact of record.

*People v. Szymanski*, No. 03-004408-01, at 13-14. The trial court's conclusion that the evidence offered by the petitioner's submissions did not discredit the trial testimony on the entrance and exit wounds is not an unreasonable determination of the facts. The evidence offered by the petitioner does not directly address or interpret the physical evidence. Habeas relief is denied.

3. Improper *ex parte* conversation with juror

In the petitioner's supplemental application for leave to appeal, which the petitioner incorporated by reference in his second amended petition, the petitioner argues that the trial judge had an inappropriate *ex parte* conversation with a juror. The petitioner further contends that the juror in question stated that Elmore may have been his track coach fifteen or twenty years earlier, and argues that the trial court's failure to dismiss the juror or to conduct a prejudice inquiry violated his right to an impartial jury. The transcript does not contain a record of that conversation. However, the record does contain a colloquy involving the judge, the prosecutor (Mr. Simone), the petitioner's stand-by counsel (Mr. Slameka), and the petitioner:

> The Court: Juror number — one of the jurors indicated that he recognized a witness as a person who may have been his track coach 15 or 20 years ago. Is that your recollection?
> Mr. Simone: He said 18 or 20.
> Mr. Slameka: 18, 20 years ago. Yes, sir.
> The Court: 18 to 20 years ago that person may have been a track coach. Any problem with that —
> Mr. Slameka: He also indicated, Judge, if you may recall, not to interrupt you, sir, that in no way would that influence his ability to be a fair and impartial juror here today.
> The Court: Any problem with that Mr. Prosecutor?
> Mr. Simone: No, Your Honor.
> Mr. Slameka: I have no problem.
> The Court: Mr. Szymanski.
> Mr. Slameka: Juror number 5, the man with the very short hair.
> The Court: Miss.
> Mr. Slameka: I just want to make it for the record.
> The Court: I didn't know if that was private or not.
> Mr. Slameka: For the record I wanted —
> The Court: Go ahead.
> Mr. Slameka: Juror number 5 raised his hand and the Judge said, hold on. After the rest of the jurors went in the jury room, he approached the bench and said, that last witness may have been his track coach about 18 to 20 years ago. And that even if

-41-

it were, he could still be a fair and impartial juror. The Judge asked him that. I just
wanted to let you know that.
The Defendant: Okay, thank you.
Mr. Slameka: And furthermore, I'm sorry — furthermore, I and Mr. Simone
indicated that we didn't think that would affect his ability to be a fair and impartial
juror because he so indicated he could be.
The Court: Right. Any problems with that Mr. Simone?
Mr. Simone: No.
The Court: Mr. Szymanski?
The Defendant: No, Your Honor.
The Court: Mr. Slameka.
Mr. Slameka: I have none.

Trial Tr., Sept. 11, 2003, at 86-88. Based on the transcript, it is clear that the trial court judge did

not have an *ex parte* conversation with a juror; instead, the prosecutor and the petitioner's stand-by

counsel — and possibly the petitioner himself — were present for the conversation. However, the

petitioner also argues that he was denied his right to an impartial jury because one of the jurors may

have known Elmore.

The Sixth Amendment right to trial by jury includes the right to a fair trial by a panel of

impartial jurors. *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961); *United States v. Shackelford*, 777 F.2d

1141, 1145 (6th Cir. 1985). In *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court

recognized that juries in criminal cases must be free from extraneous influences. The Court wrote:

> In a criminal case, any private communication, contact, or tampering directly or
> indirectly, with a juror during a trial about the matter pending before the jury is, for
> obvious reasons, deemed presumptively prejudicial, if not made in pursuance of
> known rules of the court and the instructions and directions of the court made during
> the trial, with full knowledge of the parties.

*Id*. at 229. The *Remmer* Court established a framework for addressing claims that a jury was

exposed to outside influence:

> The trial court should not decide and take final action ex parte on information such
> as was received in this case, but should determine the circumstances, the impact

thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

*Id*. at 229-30. "A court must seek assurance from the juror that [he] is capable of proceeding without bias, and if a trial court 'views juror assurances of continued impartiality to be credible, the court may rely upon such assurances.'" *Jackson v. Bradshaw*, 681 F.3d 753, 766 (6th Cir. 2012) (quoting *United States v. Parnell*, 737 F.3d 521, 533 (6th Cir. 1984)).

In *Remmer*, the Supreme Court established a right to a hearing when a colorable allegation of jury contamination is raised. The issue raised by the petitioner here is not that he was deprived of such a hearing; it is clear from the record that a hearing was held. Instead, he insists that he was prejudiced by the fact that Elmore may have been the track coach of one of the jurors 18 or 20 years earlier. The Due Process Clause does not permit a jury to decide a case using extraneous information, including information derived from a juror's previous relationship with a party. *Jackson*, 681 F.3d at 766. "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

The state trial judge was satisfied that the juror was capable of rendering an impartial decision in this case. "[S]ince the trial judge is in the best position to determine the nature and extent of alleged jury misconduct, his decision on the scope of proceedings necessary to discover misconduct is reviewed only for an abuse of discretion." *United States v. Rigsby*, 45 F.3d 120, 125 (6th Cir. 1995) (quoting *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985)). In a habeas corpus case, a state court's findings on whether, and how, an extraneous matter affected jury deliberations "deserve [ ] a 'high measure of deference.'" *Mahoney v. Vondergritt*, 938 F.2d 1490,

-43-

1492 (1st Cir. 1991) (quoting *Rushen v. Spain*, 464 U.S. 114, 120 (1983)).  And a constitutional error that implicates trial procedures is deemed harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

The Court is not convinced that the participation of the juror had a substantial and injurious effect on the jury's verdict.  The juror apparently did not state definitively that Elmore had been his track coach, only that "a witness" may have been his track coach.  Moreover, the juror in question stated that even if Elmore were his old track coach, he could still be a fair and impartial juror.  "[A]s the Supreme Court has explained, a juror's assertion that [he] is fit to proceed is not 'inherently suspect.'"  *Jackson*, 681 F.3d at 767 (quoting *Smith*, 455 U.S. at 217 n. 7).  In light of the great deference afforded to the trial court's determination, the Court concludes that the petitioner is not entitled to habeas relief on this claim.

### 4. Trial court bias

In the petitioner's supplemental application for leave to appeal, which the petitioner incorporated by reference in his second amended petition, the petitioner argues that the state court trial judges involved in his case were biased against him.  He says that Judge Waterstone, who conducted some pretrial hearings in the case, has been accused of allowing perjured testimony and that she violated the petitioner's constitutional rights to a fair trial.  He says Judge Sullivan's bias is demonstrated because he permitted gunshot residue to be introduced at trial.  Neither of these claims has merit.

Judicial misconduct claims impugning the impartiality of the judge fall into two categories.  One group addresses charges of "judicial bias" stemming from a trial judge's "personal interest" in

-44-

the outcome of a case, usually derived from some extrajudicial association with the cause or with one of the parties. *See In re Murchison*, 349 U.S. 133, 136 (1955). The second group concerns charges of "judicial misconduct" in which the trial judge is accused of conducting the proceedings in a manner that strongly suggests to the jury that the judge disbelieves the defendant's case or otherwise favors the prosecution. *See Liteky v. United States*, 510 U.S. 540, 555-56 (1994); *see also Alley v. Bell*, 307 F.3d 380, 386 (6th Cir.2002).

The petitioner has not suggested that either had a personal interest in the case that resulted in bias against him. Nor has the petitioner identified any behavior or comments by the trial judges that even hint at the possibility that the judges were biased or prejudiced against the petitioner, beyond the conclusory assertions that the judges violated the petitioner's rights. "[T]he Supreme Court [has] held that 'judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.' To show improper prejudice, a judge's comments must 'display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Wilson v. Parker*, 515 F.3d 682, 701 (6th Cir. 2008) (quoting *Liteky*, 510 U.S. at 555). The petitioner has pointed to nothing in the record that would meet this standard. Therefore, the claim does not warrant habeas relief.

### 5. Appellate court's use of harmless error standard

In his first amended petition, the petitioner challenges the Michigan Court of Appeals' use of the harmless error standard in evaluating his direct appeal, which he says was error because the state did not argue harmless error in its appellate brief and raised it only "belatedly." Am. Pet. at 5. The only issue on which the Michigan Court of Appeals applied a harmless error analysis was the issue of the improper admission of the letter to Linda Burleson. The court cited Michigan

-45-

Compiled Laws § 769.26, which provides that "[n]o. . . verdict shall be set aside or reversed or a new trial granted by any court of this state in any criminal case, on the ground of . . . the improper admission . . . of evidence . . . unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." Mich. Comp. Laws § 769.26. The petitioner has pointed to no Supreme Court decision that says a harmless error analysis ought not be applied in this situation, and the Court is aware of none. In fact, harmless errors cannot justify a writ of habeas corpus. *See Brecht*, 507 U.S. at 637. Therefore, the state court's application of the harmless error standard was neither contrary to nor an unreasonable application of clearly-established federal law and the petitioner is not entitled to habeas relief.

## I.

The petitioner argues that his appellate counsel was ineffective because appellate counsel failed to review the transcript, investigate errors that occurred during trial, and raise any of the arguments raised by the petitioner in this proceeding. The trial court, the last state court to issue a reasoned decision on the issue of ineffective assistance of appellate counsel, found that appellate counsel was not ineffective by failing to raise issues relating to the petitioner's self-representation, the gunshot wounds, and Elmore's intoxication on appeal. The trial court held that it was not ineffective assistance not to raise those issues, because they are "not meritorious." *People v. Szymanski*, No. 03-004408-01, at 16 (Wayne Cnty. Cir. Ct. June 12, 2008).

The right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To prevail on a claim of ineffective assistance of appellate counsel, the petitioner must demonstrate that appellate counsel's performance

was deficient and that the deficient performance prejudiced the appeal. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

The Supreme Court has made clear that a criminal defendant has no constitutional right to demand that appellate counsel raise every possible colorable issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751-52). Appellate counsel thus need not raise every nonfrivolous issue, but he or she must exercise reasonable professional judgment. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (citing *Jones*, 463 U.S. at 751-53).

A petitioner is prejudiced by appellate counsel's deficient performance if a reasonable probability exists that, but for counsel's deficient performance, he would have prevailed on appeal. *See Riley v. Jones*, 476 F. Supp. 2d 696, 709 (E.D. Mich. 2007); *see also Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich.2003) (appellate counsel may prejudice a defendant by omitting a "dead-bang winner," an "issue . . . obvious from the trial record . . . which would have resulted in reversal on appeal").

In support of his contention that appellate counsel failed to review transcripts, the petitioner presents the first page of a letter that appears to be from the state appellate defender's office, and which states that "[i]t does not appear that prior appellate counsel ever ordered" transcripts of the petitioner's July 1, July 18, and August 29, 2003 pre-trial hearings concerning the petitioner's

-47-

waiver of counsel for the re-trial. Reply [dkt. #61] at 40. The failure to review those transcripts certainly would fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. However, because, as discussed above, the petitioner has failed to show that his rights were violated by the trial court's decision to permit him to represent himself, the petitioner cannot demonstrate that he was prejudiced by appellate counsel's failure. As for the petitioner's argument that appellate counsel was ineffective by failing to raise the claims advanced in this proceeding, the Court cannot agree. Those issues have no merit. Appellate counsel need not raise non-meritorious claims on appeal. *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (citing *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). Accordingly, the Court will deny habeas corpus relief on this claim.

J.

In his final claim, the petitioner argues that admission of his statement to Detective Brown violated his rights under the Confrontation Clause because the petitioner did not testify. That issue makes no constitutional sense. The Sixth Amendment guarantees an accused person the right "to . . . confront[] the witnesses against him." U.S. Const. Am. VI. The statement the petitioner references is his *own* statement. *See United States v. Romo-Chavez*, 681 F.3d 955, 961 (9th Cir. 2012). The *Fifth* Amendment prohibits the state from compelling an accused to be a witness against himself. But the petitioner does not name that argument here.

There is no basis to grant a writ of habeas corpus based on the admission of the petitioner's statement to the police.

III.

For the reasons stated, the Court concludes that the petitioner has not established that he is in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the amended petition for writ of habeas corpus is **DENIED WITH PREJUDICE**.

It is further **ORDERED** that the petitioner's motion to review newly discovered sentencing issue [dkt. #80] is **DENIED**.

It is further **ORDERED** that the petitioner's motion for relief from prison transfer [dkt. #84] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 7, 2013

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 7, 2013.

s/Deborah R. Tofil
DEBORAH R. TOFIL

---